879 A.2d 854 (2005)
William D. REX, Petitioner
v.
WORKERS' COMPENSATION APPEAL BOARD (CITY OF OIL CITY), Respondent.
Commonwealth Court of Pennsylvania.
Submitted on Briefs June 17, 2005.
Decided July 25, 2005.
*855 Brian D. Cox, Pittsburgh, for petitioner.
Jason A. Rosenberger, Pittsburgh, for respondent.
BEFORE: COLINS, President Judge, FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.
OPINION BY Senior Judge McCLOSKEY.
William D. Rex (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board), dated December 1, 2004, which affirmed a decision of a Workers' Compensation Judge (WCJ), dismissing a claim petition for benefits pursuant to the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§ 1-1041.4, 2501-2626. We now affirm.
Claimant was employed as a firefighter and paramedic with the City of Oil City (Employer). Claimant filed a claim petition pursuant to Section 108(o) of the Act, added by Act of October, 17, 1972, P.L. 930, as amended, 77 P.S. § 27.1(o), alleging that he suffered an injury or occupational disease on September 22, 1998, as a result of "exposure to the hazards of fire fighting, including physical and emotional stress, inhalation of smoke and other toxins for greater than four (4) years." (R.R. at 1). On that day, Claimant had suffered a heart attack. Employer filed an answer denying the allegations of Claimant's claim petition. (R.R. at 5).
In support of the claim petition, Claimant presented his own testimony and the deposition testimony of Dr. Jack Smith, who is certified in internal medicine and cardiology. Employer presented the testimony of John Huey, Jon Slater, Mike Wise, Thomas Rockovich, Richard Bigelow and Dr. Larry Hurwitz, who is also certified in internal medicine and cardiology.
Claimant testified that on September 22, 1998, he was employed by Employer as a fire fighter/paramedic. (R.R. at 75). He had worked for Employer for over seventeen (17) years. Claimant generally worked a twenty-four (24) hour work shift, beginning at 7:30 a.m. (R.R. at 76). During his shift ending on September 22, 1998, he responded to numerous medical alarms and a couple of false fire alarms. (R.R. at 82). Around 11:00 p.m., he went out to check the pressure and flow of water hydrants to make sure that they were operational. Id. In order to check the hydrants, he used a steel wrench, approximately 28 inches in length, to remove the cap. (R.R. at 83). He testified that sometimes it would require fifteen (15) to twenty (20) cranks of the wrench to open a hydrant. Id. He testified that it required frequent hoisting and a great deal of "arm and chest work" to get the hydrant open. Id. While he was checking the hydrants, he was wet from the water splashing on him. (R.R. at 84). Additionally, he testified that he felt some tightness and pain in his chest, but he thought that it could be a pulled muscle because it was strenuous *856 work. Id. He finished around 3:00 or 3:30 a.m., having checked about twenty hydrants. (R.R. at 84-85). When he returned to the station, he laid down in his bed. However, he said that he continued to have chest pain and did not sleep. (R.R. at 85). He arose at 7:00 a.m. and went home at 7:30 a.m. (R.R. at 85-86). Throughout the day, the chest pain became unbearable, and he went to the emergency room. (R.R. at 86).
Claimant testified that since his heart attack, he has been unable to return to work. (R.R. at 88). His doctor placed work restrictions on him. He must avoid smoke, physical and emotional stress and temperature extremes. (R.R. 89).
On cross-examination, Claimant testified that he has a family history of heart disease in that his father had heart problems which required open heart surgery. (R.R. at 91). In addition, Claimant smoked cigarettes for twenty years prior to his heart attack. (R.R. at 93).
On cross-examination, Claimant was asked why the medical history from his emergency room visit stated that his symptoms developed while he was sleeping and that he was awakened by chest pain. (R.R. at 100-101). He testified that he was awoken by the chest pain after he had lain down, but that he had some discomfort prior to that. (R.R. at 101). He believed that he had told the medical people that his symptoms occurred initially when he was cranking open the valves. Id. His chest pain woke him around 4:00 a.m. Id. His pain had initially developed while cranking hydrants around 2:00 a.m. Id. He agreed that the pain that woke him up was greater than the pain that he felt when he was opening hydrants. (R.R. at 102). He had not smoked any cigarettes while he was opening hydrants, but he did smoke a cigarette when he returned to the station before he went to bed. Id.
During subsequent hearings, Claimant testified regarding his clothing, wetness on the night in question and temperature. He testified that when he was testing the hydrants, the water would spray all over him. (R.R. at 208-212). He was wet enough that he had to hang his clothes up to dry when he returned to the fire station. Id. He wore a coat because he was cold as a result of being wet. Id. His coat, shirt, undershirt and socks were wet. (R.R. at 208-212, 224). He was not shivering and shaking, but he was chilled.[1] (R.R. at 224).
John Huey testified on behalf of Employer. (R.R. at 119). He testified that he has been employed by Employer for over thirty-two (32) years, and that he has been chief of the fire department for the last five (5) years. (R.R. at 119) He testified that Claimant told him that he awoke at 4:00 a.m. with some severe chest pain. (R.R. at 124). On the occasions that Chief Huey spoke with Claimant during the month following the incident, Claimant never mentioned that his heart discomfort or pain developed as he was opening fire hydrants. (R.R. at 124-128).
Additionally, Chief Huey testified that he has opened fire hydrants numerous times and that it normally should not require a significant degree of force. (R.R. at 144-145). However, there are occasions when they stick. Id. If that occurs during normal maintenance, a firefighter is instructed not to continue to try to open it. Id. They are to make a note of it. Id. He stated that generally, a hydrant can be opened with eight to fifteen revolutions *857 and that he does not consider that to be very laborious. Id.
Jon Slater also testified on behalf of Employer. He testified that he is employed as a lieutenant for the fire department. (R.R. at 150). He has been employed by Employer for over twenty-nine (29) years. (R.R. at 150-151). Lieutenant Slater was assigned to test hydrants with Claimant on the day that Claimant suffered his heart attack. (R.R. at 152). He was monitoring from a different location, but he was in radio communication with Claimant. (R.R. at 154-156). During the work with the hydrants, Claimant did not mention to Lieutenant Slater any problems with his chest. (R.R. at 157). After they finished working with the hydrants, they returned to the station at 2:40 a.m. (R.R. at 159). Lieutenant Slater retired to bed before Claimant. (R.R. at 160). The temperature at 11:00 p.m. that evening was approximately sixty-five (65) degrees. (R.R. at 160-161).
Michael Wise also testified for Employer. He is employed by the City of Oil City, Water Distribution Department. (R.R. at 176). He was working right next to Claimant while Claimant was opening the hydrants. (R.R. at 176-177). He testified that Claimant did not mention having any pain or discomfort involving his chest. (R.R. at 177). He did not observe anything out of the ordinary. Id. On cross-examination he testified that it takes some force to open a hydrant.[2] (R.R. at 179).
Claimant introduced the deposition testimony of Jack E. Smith, M.D., who is board certified in internal medicine and cardiology. (R.R. at 251). Dr. Smith first saw Claimant on September 23, 1998. (R.R. at 255). Claimant had been transferred to St. Vincent Health Center from Franklin Regional Medical Center, having suffered a non-Q-wave myocardial infarction or heart attack. (R.R. at 256). Dr. Smith noted that Claimant had a positive isoenzyme, or CPK.[3] (R.R. at 257-258). Dr. Smith reviewed Claimant's history, conducted a physical examination, reviewed test results and ordered tests. (R.R. at 258-261). He testified that Claimant suffered a small, non-Q-wave heart attack. (R.R. at 261). Dr. Smith performed a heart catheterization, which showed that Claimant had insignificant disease, "meaning that he had no blockages of greater than 75 percent in the coronary arteries." (R.R. at 265). Dr. Smith provided the following testimony regarding the nature of Claimant's condition and the medical therapy recommended:
Q: And what was the nature of the medical therapy?
A: Given his insignificant disease, the etiology of his myocardial infarction was coronary vasospasm and/or what we call in situ thrombosis, meaning you form a clot spontaneously in the artery of the heart, which can also be formed by spasms, so, it is sort of a vicious cycle. The treatment for that is medical therapy. He had no significant lesions so he did not require bypass or any angioplasty. His treatment is medical therapy directed at reducing the incidence of coronary spasm....
(R.R. at 265-266).
Dr. Smith testified that he placed restrictions on Claimant, including that he *858 was to refrain from going back to work. (R.R. at 267-268). He stated that there are several things that can promote coronary vasospasm, including stress, extreme temperature, and being exposed to smoke. Id.
When asked whether Claimant's work duties on his last work shift prior to his diagnosis of myocardial infarction were a substantial contributing factor to his myocardial infarction, Dr. Smith testified that Claimant was exposed to some significant stress in terms of working with the fire hydrants and was exposed to some extremes of temperature that evening in that he was soaking wet. (R.R. at 269-270). He testified that those events can promote coronary spasm. It was his opinion that those events were significant contributing factors to Claimant's myocardial infarction. Id.
On cross-examination, Dr. Smith acknowledged that it has been established that vasospasms can develop while a person is smoking a cigarette or shortly after smoking a cigarette. (R.R. at 296-297).
Employer presented the deposition testimony of Larry Hurwitz, M.D. He testified that he reviewed records, took a history from Claimant and evaluated Claimant on May 12, 1999. Like Dr. Smith, Dr. Hurwitz was of the opinion that Claimant had insignificant coronary artery disease and that he suffered a vasospasm. (R.R. at 319-325). He explained as follows:
There are certain phenomena that can cause constriction of blood vessels in the absence of any underlying coronary disease. There are stimulants that affect muscle contraction function. The most common of these are tobacco smoke, caffeine, cocaine is one of the most common causes of coronary vasospasm. That is certainly not an issue here. Exposure to unusual physical stresses can be identified with the onset of coronary vasospasm. It is not quite as clear that intention emotional exposure [sic] does, but it's certainly conceivable. Exposure to severe temperatures, particularly cold more so than hot, can result in a vasospastic response. These are usually transient events of spasm in isolated segments of coronary arteries, not diffusely through the coronary arteries. They are usually transient and in some rare cases can result in myocardial infarction or even sudden death.
(R.R. at 323). He further testified as follows:
Q: Now, contrast a heart attack caused by a vasospasm with a routine heart attack that we hear about?
A: Right. It's an important distinction because vasospasm is a rare event. It's an unusual event. It is clearly less than five percent of the cause of all myocardial infarctions. The vast majority, well over 90 percent of all myocardial infarctions occur in the setting of significant coronary artery disease. Blood vessels that have over time developed significant obstruction to blood flow that make these plaques inside the coronary arteries vulnerable to rupture. The natural history of that process is somewhat different than the natural history of patients susceptible to coronary vasospasm. Patients who have significant coronary obstruction are at risk from physical event, even mild to moderate physical events. If they have significant underlying coronary disease, they may undergo a process known as plaque rupture. These plaques that develop over years become vulnerable and break and produce blood clots or thrombus inside the blood vessels. This is the mechanism of the vast majority of heart attacks or myocardial infarctions.
(R.R. at 323-324).
Dr. Hurwitz further testified that the history taken by Dr. Smith notes that *859 Claimant experienced the onset of pain when he was awakened from sleep at the fire station. (R.R. at 326-327). The history does not note any problems earlier than that. Id.
Dr. Hurwitz opined that "it is impossible to relate his occupational activities as a precipitating or substantial factor in causing the acute myocardial infarction." (R.R. at 330). He based that opinion on his belief that the precise start of his myocardial infarction cannot be pinpointed based upon cardiac isoenzymes. (R.R. at 330-332). Additionally, timing of the onset of symptoms during Claimant's sleep was too remote from the activities he had done while performing his job. (R.R. at 330). He discounted Dr. Smith's opinion that extreme temperatures caused the vasospasm in that he did not believe that the water and air temperatures were cold enough to cause a spasm. (R.R. at 334-335).
By decision and order dated January 29, 2001, the WCJ denied and dismissed the claim petition, having concluded that Claimant did not sustain his burden of proof to establish that he suffered a compensable heart attack. In reaching that decision, the WCJ found as follows:
It is clear from the expert testimony presented by both of the parties that the Claimant's medical problem and disability did not result from a disease of the heart or lungs; but that rather, he experienced a vasospasm and/or thrombosis which produced a non-Q-wave heart attack. They agree that a certain percentage of the population is prone to developing vasospasm, and that this tendency was not caused by the Claimant's cumulative exposure to heat and smoke and so forth. Both experts agree that this would be classified as a minor heart attack which would not have caused any significant damage to the Claimant's heart muscles. Both experts also agree that because the Claimant has experienced this one vasospasm, and because inhalation of smoke (including cigarette smoke) is one (1) of the known triggers for vasospasm, it is not safe for him to ever return to work as a fireman. No evidence whatsoever has been presented to establish that there is a greater incidence of this type of heart attack or heart condition among firemen, as comparable to the general public. Accordingly, this is an injury case; not an occupational disease case.
(R.R. at 9).
Claimant appealed the matter to the Board. The Board considered whether the WCJ erred as a matter of law when he concluded that Claimant's case was an "injury case" rather than an occupational disease case, such that the WCJ applied a heightened burden of proof. The Board also considered whether the WCJ issued a reasoned opinion. By order and opinion dated February 19, 2002, the Board concluded that the WCJ erred by applying a heightened burden of proof in his analysis. Additionally, the Board concluded that the WCJ failed to issue a reasoned decision. The Board noted that Section 108(o) of the Act provides that diseases of the heart and lungs after four (4) or more years of firefighter duties are considered an occupational disease. The Board continued that under Gregorious v. Workers' Compensation Appeal Board (European Health Spas), 87 Pa.Cmwlth.86, 486 A.2d 564 (1985), there is no requirement of proof that there is a greater incident of this condition among firefighters as compared to the general public. For those reasons, the Board vacated the WCJ's decision and order and remanded the matter.
On remand, the WCJ attempted to explain the reasoning that he had employed when the matter had previously been before *860 him. He stated that although he did not understand the Board's reasoning, he was "duty bound" to obey the instructions. The WCJ interpreted the Board's opinion and order as instructing him that, pursuant to the Act, causation is established in this case. Solely for that reason, the WCJ granted the claim petition and awarded benefits.
Employer then appealed the matter to the Board. The Board considered whether the WCJ committed an error of law when it determined that Claimant suffered an occupational disease and whether the WCJ failed to issue a reasoned decision. In doing so, the Board wrote:
[Employer] avers that the WCJ committed errors of law in adjudication of the Claim Petition. We agree. Although the WCJ specifically found that this Board `has held that the Act supplies the causation element for [Claimant]' such is a misreading of our February 19, 2002, Opinion and Order. This Board's discussion of the occupational disease section of the Act should in no way be interpreted to mean that this Board is mandating that the WCJ apply such sections.[[4]]
(R.R. at 42-43). Additionally, the Board concluded that the WCJ failed to issue a reasoned decision. By opinion and order dated August 19, 2003, the Board again vacated the WCJ's decision and order and remanded the matter.
On remand to the WCJ, by decision and order dated January 26, 2004, the WCJ again denied and dismissed the claim petition. The WCJ explained that in his first decision and order, dated January 29, 2001, he had found that there was no question medically that the Claimant's heart problem was not the product of a disease of the heart or lungs. (R.R. at 49). Accordingly, he determined that it was not an occupational disease case pursuant to Section 108(o). Id. Therefore, Claimant was not entitled to the presumption of work-relatedness which flows out of Section 108(o) of the Act. Id. The WCJ further explained that there was no evidence to satisfy the requirements of Section 108(n) of the Act, added by Act of October, 17, 1972, P.L. 930, as amended, 77 P.S. § 27.1(n), which subsection is often referred to as the "catch-all."[5] The WCJ explained that because it was not an occupational disease case under any subsection of Section 108 of the Act, he had then analyzed the evidence in the case using an injury standard rather than a disease standard. Id. The WCJ clarified his position further, by writing as follows in his decision and order, dated January 26, 2004:
Hopefully the foregoing explanation makes it sufficiently clear (and if not then a review of the previous decision *861 which I and the Board have issued will make it sufficiently clear) that none of the medical witnesses established this as an occupational heart or lung disease whatsoever, and that this is not decided as an occupational disease case. The Claimant is a fireman who suffered a heart attack due to vasospasm, not due to any disease. This is a case where the Claimant suffered a heart attack because he is one of those few people who have a propensity to experience vasospasms which subsequently will trigger myocardial infarctions. The medical issue was whether the Claimant's vasospasm was caused by exertion at work or other stressful factors, not whether he has an occupational disease (which plainly he does not).
(R.R. at 51).
Claimant again appealed the matter to the Board, raising arguments that were similar to those it raised in the first appeal to the Board. By opinion and order dated December 1, 2004, the Board affirmed the WCJ's order. Claimant then filed a petition for review with this Court, which is the subject of this appeal.
On appeal,[6] Claimant first argues that the Board and WCJ erred because they failed to recognize that Claimant is entitled to the presumption under Section 301(e) of the Act, added by Act of October 17, 1972, P.L. 930, 77 P.S. § 413, that his heart condition is a result of his employment as a firefighter. Claimant also argues that Employer failed to rebut the presumption that Claimant's heart condition is a result of his employment as a firefighter. As a result, Claimant contends that the Board and WCJ erred in not granting the claim petition. Employer counters that Claimant's heart attack was caused by a coronary vasospasm and was not caused by a "disease" as defined under the Act. Therefore, the WCJ and Board correctly held that Claimant was not entitled to the presumption under Section 301(e) of the Act, meaning that Claimant bore the burden of establishing causation. Alternatively, Employer argues that should this Court conclude that Claimant is entitled to a presumption pursuant to Section 301 of the Act, then a remand is necessary for the purpose of allowing the WCJ to reconsider the evidence in light of the presumption.
Section 108(o) of the Act states that the term "occupational disease" includes:
Diseases of the heart and lungs, resulting in either temporary or permanent total or partial disability or death, after four years or more of service in fire fighting for the benefit of or safety of the public, caused by extreme over-exertion in times of stress or danger or by exposure to heat, smoke, fumes or gasses, arising directly out of the employment of any such fireman.
*862 A claimant proceeding under Section 108(o) of the Act "must first establish that he or she is suffering from and disabled by this particular occupational disease." Buchanan v. Workmen's Compensation Appeal Board (City of Philadelphia), 659 A.2d 54 (Pa.Cmwlth.1995), petition for allowance of appeal denied, 542 Pa. 675, 668 A.2d 1137 (1995). Once a claimant establishes that he is suffering from and disabled by the occupational disease, then the claimant is entitled to a presumption that the occupational disease arose out of and in the course of his or her employment. Buchanan; see also Section 301(e) of the Act.[7] The presumption is not conclusive and may be rebutted by substantial, competent evidence. Buchanan; see also Marcks v. Workmen's Compensation Appeal Board (City of Allentown), 119 Pa.Cmwlth.214, 547 A.2d 460 (1988). The importance to a claimant of the occupational disease status provided for firemen by the Legislature was recognized by the Supreme Court in Pawlosky v. Workmen's Compensation Appeal Board (Latrobe Brewing Company), 514 Pa. 450, 462, 525 A.2d 1204, 1211 (1987), when it noted that a claimant who is seeking to recover for an occupational disease is provided "a procedural or evidentiary advantage" once he establishes that he suffers from a occupational disease specified in Section 108(o) of the Act. See also Edwards v. Workmen's Compensation Appeal Board (Hunlock Township), 137 Pa.Cmwlth.70, 585 A.2d 56 (1990), petition for allowance of appeal denied, 528 Pa. 633, 598 A.2d 286 (1991).
The issues before this Court essentially require us to decide whether the WCJ and Board properly determined that Claimant did not suffer from an occupational disease, such that Claimant was not entitled to the presumption that his disease was work-related, or whether the WCJ and Board acted improperly by not affording Claimant the benefit of the presumption, which Employer could then attempt to rebut. This appears to be a case of first impression to the extent that we must determine whether a certain type of heart condition, specifically a non-Q-wave heart attack caused by a vasospasm, constitutes a "disease of the heart," such that Claimant is entitled to the presumption that he suffers from an occupational disease which arose out of and in the course of his or her employment.[8]
*863 Section 108 of the Act states that "[t]he term `occupational disease' ... shall mean only the following diseases," then it lists certain conditions that are to be considered occupational diseases, including "diseases of the heart and lungs" that occur in firemen as further described in Section 108(o) of the Act. Interestingly, the term "disease" itself is not defined. This leaves open the question of what conditions involving the heart and lungs are considered "diseases of the heart and lungs" under Section 108(o) of the Act.
In Pawlosky, the Supreme Court considered whether a job-related aggravation of a pre-existing disease was precluded from being considered an "injury" under the Act merely because that disease is not specifically designated as an occupational disease by Section 108 of the Act. In considering that issue, the Supreme Court examined the history of the Act and that of The Pennsylvania Occupational Disease Act of 1939 (the Occupational Disease Act), Act of June 21, 1939, P.L. 566, as amended, 77 P.S. §§ 1201-1603, and it reviewed certain definitions associated with those acts. When considering the definitions of some terms used in the Act, the Supreme Court stated that it is "clear that, from early in the history of this state's workmen's compensation legislation, some concepts central to the recovery of benefits were to be given their legal meaning and scope by the courts." Pawlosky, 514 Pa. at 457, 525 A.2d at 1208. The analysis and history set forth in Pawlosky are useful to us in our consideration of the appropriate definition of "diseases of the heart and lungs" in the instant matter.
The Supreme Court explained that the Act, as originally enacted in 1915, provided benefits only for injury or death resulting from an "accident" in the course of employment. Pawlosky. "Under the original Act, there was no provision for disease unless it resulted naturally from an accidental and traumatic injury. Accordingly, the statute did not cover `occupational diseases.'" Pawlosky, 514 Pa. at 457, 525 A.2d at 1208. The Act was amended in 1937 to provide some coverage for occupational diseases, but that coverage was replaced by the Occupational Disease Act, "which created a distinct and separate system of compensation for certain types of diseases contracted strictly through exposure in the course of employment." Pawlosky, 514 Pa. at 457, 525 A.2d at 1208. In 1972, the Act underwent extensive amendment, including how it applied concepts relating to "accidents" and "injury." Pawlosky. The Supreme Court noted that "by virtue of the 1972 addition of [S]ection 301(c)(2) [of the Act], 77 P.S. § 411(2), occupational diseases, as defined in section 108, are included in the concept of `injury' under the [Act]." Pawlosky, 514 Pa. at 459, 525 A.2d at 1209. The Supreme Court concluded that subsequent to the 1972 amendments, the term "injury" in Section 301(c)(3) of the Act no longer had a technical meaning. Pawlosky. Therefore, the Supreme Court interpreted the meaning of the term "injury" according to its common and approved usage.
The Supreme Court in Pawlosky rejected the notion that the legislature, after expanding the concept of "injury" in Section 301(c)(1) of the Act, "then proceeded to retract the scope of the concept when it included `occupational diseases' by means of [S]ection 301(c)(2)" of the Act. Pawlosky, 514 Pa. at 461, 525 A.2d at 1204. Rather, the Supreme Court reasoned that the legislature, by including occupational diseases in the Act, "was attempting to create a unified integrated compensation law for all work-related harm occurring after the effective dates of the 1972 amendments." Pawlosky, 514 Pa. at 461, 525 A.2d at 1204. In determining such, the Supreme Court noted that the validity *864 of the explanation is not diminished by the fact that the Occupational Disease Act remains unrepealed. Pawlosky. The Supreme Court stated that the Occupational Disease Act was to remain in force with regard to occupational diseases contracted prior to the effective date of the 1972 amendments. Pawlosky. The Supreme Court noted that "diseases covered by the 1939 statute are essentially similar to those provided for in [S]ection 108" of the Act. Pawlosky, 514 Pa. at 461, n. 9, 525 A.2d at 1210, n. 9. Importantly, the Supreme Court in Pawlosky also wrote, as follows:
In the Mauchline[[9]] and McCauley[[10]] cases, the term `occupational disease' was judicially defined as meaning a disease which was the result, not of an accidental and sudden injury, but of gradual development from long-continued exposure to natural dangers incident to one's employment.
Pawlosky, 514 Pa. at 458, n. 4, 525 A.2d at 1209, n. 4.
That description of "occupational disease" is significant. It is clear from Pawlosky that the Supreme Court interprets the term "occupational disease," under both the Occupational Disease Act and Section 108(o) of the Act, as being a condition that develops over time as a result of some type of exposure. In the case at hand, Claimant's condition cannot be described as such. Therefore, the WCJ and Board did not err when they determined that Claimant did not suffer an occupational disease pursuant to Section 108(o) of the Act. As such, Claimant was not entitled to a presumption that his condition was work-related.
Accordingly, we must affirm the order of the Board.

ORDER
AND NOW, this 25th day of July, 2005, the order of the Workers' Compensation Appeal Board, dated December 1, 2004, is hereby affirmed.
NOTES
[1] Employer introduced some records and testimony that suggested that the water and air temperature may have been around sixty-five degrees while Claimant was testing the hydrants. (R.R. at 225-228; 231-242).
[2] Employer also presented the testimony of Thomas Rockovich, who is employed by Employer as the city manager of the City of Oil City. He testified regarding financial matters. (R.R. at 188-200).
[3] CPK stands for creatine phosphokinase, which a normal component of muscle cells that leaks into the blood when cells die. Id. CPK is also used as a measurement for heart attacks. Id.
[4] The Board further explained:

It was merely the notation of error on the part of the WCJ by Finding that because `[n]o evidence whatsoever has been presented to establish that there is a greater incidence of this type of heart attack or heart condition among firemen, as compared to the general public' that this was `not an occupational disease case.' (Finding 6). Indeed, it was error for the WCJ to find this was not an occupational disease case simply because Claimant failed to prove a greater incidence of this type of heart attack or heart condition among firemen, as compared to the general public.
(R.R. at 42-43).
[5] Section 108(n) of the Act further defines an "occupational disease" to include the following:

All other diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are causally related to the industry or occupation, and (3) the incidence of which is substantially greater in that industry or occupation than in the general population....
[6] Our scope of review in a workers' compensation appeal is limited to determining whether an error of law was committed, constitutional rights were violated, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Ryan v. Workmen's Compensation Appeal Board (Community Health Services), 550 Pa. 550, 707 A.2d 1130 (1998). We acknowledge our Supreme Court's decision in Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe), 571 Pa. 189, 812 A.2d 478 (2002), wherein the Court held that "review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." Wintermyer, 571 Pa. at 203, 812 A.2d at 487.
[7] Section 301(e) of the Act, 77 P.S. § 413, provides that:

If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive.
[8] Other cases involving "disease of the heart and lungs" that were considered by this Court in connection with Section 108(o) of the Act addressed conditions that were more obviously "heart and lung diseases." See Edwards (volunteer firefighter whose death was caused by an acute myocardial infarction as a result of hypertension and chronic obstructive pulmonary disease died as a result of an occupational disease such that he was entitled to the presumption afforded by Section 301(e) of the Act, which the employer failed to rebut); Buchanan (claimant who suffered from coronary artery disease was disabled as a result of an occupational disease and was entitled to the presumption afforded by Section 301(e) of the Act, which the employer successfully rebutted); Kelley (firefighter who suffered from chronic obstructive pulmonary disease was disabled as a result of an occupational disease and was entitled to the presumption afforded by Section 301(e) of the Act, which employer successfully rebutted). Those cases did not address whether the underlying heart or lung condition constituted a "disease of the heart or lungs." Rather, those cases focused on whether the employer rebutted the presumption pursuant to Section 301(e) of the Act that the occupational disease was job-related.
[9] Mauchline v. State Insurance Fund, 279 Pa. 524, 124 A. 168 (1924).
[10] McCauley v. Imperial Woolen Co., 261 Pa. 312, 104 A. 617 (1918).