Jerry Mercer, : 
                Petitioner : 
                          : 
        v. : 
                          : 
Active Radiator MPN, Inc. (Workers' : 
Compensation Appeal Board), :    No. 1326 C.D. 2023 
               Respondent :    Submitted: May 7, 2024

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge 
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge 
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION 
BY JUDGE FIZZANO CANNON                         FILED: June 3, 2024

Jerry Mercer (Mercer) petitions for review from the October 18, 2023, order of the Workers' Compensation Appeal Board (Board). The Board affirmed the January 27, 2023, order of the Workers' Compensation Judge (WCJ). The WCJ denied Mercer's claim petition asserting that he sustained the occupational disease of lead toxicity from his employment with Active Radiator MPN, Inc. (Employer). Upon review, we affirm.

## I. Factual and Procedural Background

On August 24, 2018, Mercer advised Employer that he had sustained a work-related injury due to lead exposure, and on September 1, 2018, Employer issued a notice of denial asserting that Mercer did not sustain a work-related injury. Certified Record (C.R.) at 317-18.[1] On September 4, 2020, Mercer formally filed a

---

[1] Certified Record (C.R.) references are to electronic pagination.

claim petition seeking full disability benefits as of September 21, 2017, and ongoing, with partial disability between July 1, 2018, and May 31, 2019.  C.R. at. 7-10.

Mercer initially testified in an October 2020 deposition.  C.R. at 322. He is 60 years old and worked 40 hours per week since 2015 as a solderer and welder for Employer, which produces custom radiators.  *Id*. at 327-29.  He worked with lead solutions all day and wore safety gloves provided by Employer.  *Id*. at 329-30 & 403.  The lead was melted and kept in a liquid state in large dip pots.  *Id*. at 331-32 & 403.  The solution got on his clothes.  *Id*. at 333.  The process created smoke but there were exhaust fans and a ventilation system.  *Id*. at 334-35.  He does not recall being exposed to lead before working for Employer.  *Id*. at 335.  When he started, Employer showed videos that recommended respirator masks with tubes and filters, but he never received those masks.  *Id*. at 337.  He got small masks and boots, but no lead-repellent clothing, coveralls, or eye protection.  *Id*. at 337-38.  He did not change his clothes during lunch but would wash his face and hands.  *Id*. at 404-05.

Mercer stated that sometimes he got sore in his nasal membranes and had nosebleeds that he thought were from fumes, but he did not otherwise feel unwell while working.  C.R. at 340.  He used to smoke about a pack of cigarettes a day but stopped later because he could not afford it and once he realized he might have brain damage from toxic exposure at work.  *Id*. at 341 & 405-06.  Workers had their blood tested every six months and were given letters with the results.  *Id*. at 342.  In September 2017, a supervisor told him and another worker that they were being let go because he "just didn't make out" on the job.  *Id*. at 344.  He applied for and received unemployment benefits.  *Id*. at 345.  He has been on Social Security Disability for 5-6 months, gets food stamps, and is on Medicare.  *Id*. at 357-58.

2

He saw a doctor after he was let go and was given buspirone, an anxiety medication that has been helpful. C.R. at 346. He worked in 2018-19 at two restaurants but was laid off due to downsizing. *Id*. at 347-48. He has not worked since then due to his anxiety and trust issues. *Id*. at 348 & 356. He did not have emotional issues before; they started towards the end of his employment with Employer and have worsened since he was let go. *Id*. at 349-50. He sees a counselor once a week for his issues. *Id*. at 352. Physically, he has headaches and feelings of pressure in his face, neck, and ears. *Id*. at 355.

On cross-examination, Mercer stated that he grew up in and around West Philadelphia. C.R. at 361-62. He worked at various non-industrial jobs and did some outdoor construction work on older houses. *Id*. at 363-65. He completed nursing and electrician classes and worked with an electrician on older houses; he still does some occasional electrical work for friends and family who pay him cash. *Id*. at 367-75. He acknowledged filing an age discrimination claim against Employer asserting that he was let go due to his age (rather than health issues) and received a settlement in that matter. *Id*. at 408. Before working for Employer, he had no serious physical issues. *Id*. at 410-11. He acknowledged treatment 30 years ago for cocaine and alcohol use and has not used either since then; he does not smoke marijuana anymore either. *Id*. at 413-14 & 422. He lives alone in a house but is unsure how old it is. *Id*. at 421. He can maintain his house, pay his bills, drive, use a computer and smartphone, and perform daily activities. *Id*. at 421-22. He acknowledged that his October 2016 test results with high zinc[2] levels advised him to see a doctor but stated that Employer did not tell him to see a doctor, so he never did. *Id*. at 429-33.

---

[2] As will be discussed, zinc levels can correlate with lead exposure levels.

After he was laid off in September 2017 and retained counsel, he was told that his levels were higher than what Employer's tests showed. *Id*. at 438.

Mercer also testified before the WCJ in a March 2022 hearing. C.R. at 236. He stated that he was never diagnosed with a learning disability and never had trouble learning. *Id*. at 242-46. He had to repeat two grades in high school because he preferred to hang out with friends and did not attend classes. *Id*. at 244 & 266. He did not get knocked out or sustain any head injuries when he did martial arts or other sports like basketball. *Id*. at 246-47 & 260-62. His medications keep him from getting headaches and irritability. *Id*. at 248 & 252. He felt like "a big part of my body just been tampered with." *Id*. at 253. He was no longer seeing a counselor. *Id*. at 268. He still did occasional electrical jobs, just basic tasks like replacing light fixtures and switches. *Id*. at 277. When asked "what symptoms do you have which you relate to your exposure at work," he responded: "I don't have nothing that relates to my exposure at work. That's done." *Id*. at 249.

Dr. Andrew Newberg, M.D., testified for Mercer in a June 2021 deposition. C.R. at 461. He is board certified in internal medicine and nuclear medicine, which is a subspecialty of radiology involving positron emission tomography (PET) scans. *Id*. at 462-63. PET scans are a developing technology that produce images of brain function, metabolic activity, and patterns relevant to neurological and psychiatric conditions such as concussions, Alzheimer's disease, dementia, brain tumors, seizures, and depression and anxiety. *Id*. at 485-90. PET scanning originated in the mid-1970s, and Dr. Newberg does not view it as novel; there is an extensive body of research on it and guidelines for its use have been developed. *Id*. at 488-89. The results are subject to qualitative interpretation, but also have an objective component. *Id*. at 491 & 494. Dr. Newberg's practice is

academic, research-oriented, and clinical; about 10%-15% of his patients present with past exposure to toxic substances, including lead. *Id*. at 464-65 & 470.

Dr. Newberg first saw Mercer through a referral from Mercer's counsel. C.R. at 480-81. He reviewed Mercer's test results, which showed "measurable levels" indicating exposure to lead. *Id*. at 483. In April 2019, he conducted a PET scan on Mercer, which showed 14 brain areas with abnormal activity. *Id*. at 496-99 & 509. This was consistent with Mercer's description of the issues he developed after working for Employer, such as problems with concentration, tension, irritability, balance, and memory. *Id*. at 501-04 & 526-27. Dr. Newberg observed that Mercer's results showed "a brain that seems to be in an over-excited state"; areas of his brain that should "shut off" when not in use failed to do so, then those areas would "burn out" and under-function. *Id*. at 505 & 508 & 510-11.

Using a process of elimination, known as a differential diagnosis, Dr. Newberg concluded that Mercer's PET scan abnormalities and symptoms resulted from the "chronic" and "long-term" lead exposure he sustained while working for Employer. C.R. at 505-06 & 514. None of Mercer's tests while working for Employer exceeded the recognized limits for acute lead exposure, but low-level chronic exposure can cause Mercer's scan results. *Id*. at 520-23. Removal from the lead source would not necessarily decrease the lead in Mercer's brain and body; the effects and symptoms may be chronic and ongoing. *Id*. at 541. These impacts would not be visible on a traditional magnetic resonance image (MRI), which takes structural images compared with a PET scan, which is dynamic. *Id*. at 524. He acknowledged that PET scan results cannot detect when the abnormalities in a person's brain occurred. *Id*. at 552.

Dr. Newberg could not reasonably attribute the findings to any other cause, including Mercer's age or past drug, alcohol, and tobacco use, as those would not cause the specific findings in his PET scan nor would other conditions like Parkinson's disease or Alzheimer's disease. C.R. at 533 & 538. Mercer did not report prior head injuries that could be responsible. *Id*. at 545. Dr. Newberg stated that assigning chronic lead exposure as the cause of Mercer's PET scan results and reported symptoms was consistent with neuropsychological literature on the subject. *Id*. at 532. He acknowledged, however, that there is little literature at this time on the use of PET scans to diagnose lead exposure or poisoning. *Id*. at 551. He added that although Mercer's MRI did not show recognized markers for lead poisoning, those markers are usually associated with acute and high-level exposure rather than lower-level chronic exposure. *Id*. at 535-36.

Dr. Idit Trope, Ph.D., testified for Mercer in a June 2021 deposition. C.R. at 732. She is a licensed clinical psychologist with a specialty in neuropsychology, which is the study of the relationship between the brain and behavior. *Id*. at 734. She maintains an academic position and a clinical practice conducting neuropsychological assessments. *Id*. at 734-37. She has evaluated many individuals with lead toxicity and has conducted research on the effects of lead on the brain's metabolic functions. *Id*. at 737. She first saw Mercer in March 2021. *Id*. at 744. Mercer reported trust issues arising from what happened to him while working for Employer because it did not give him protective equipment and then let him go; he also reported anxiety, depression, and past issues arising from his parents' separation when he was young, which affected his school performance. *Id*. at 745 & 749. He reported his past drug and alcohol use. *Id*. at 746.

6

Dr. Trope did not detect Mercer lying or failing to give a valid effort, and he passed the measures built into the test to detect these behaviors. C.R. at 751 & 756-57. Mercer's results showed intellectual ability on the low end of the low average range. *Id*. at 752. His issues included task monitoring, inhibitory control, attention, memory, learning, slow cognitive processing, and problem solving. *Id*. Dr. Trope did not detect or diagnose attention deficit hyperactivity disorder (ADHD) or a learning disability. *Id*. at 755 & 780.

Dr. Trope concluded that Mercer's issues were consistent with chronic low-level lead exposure in an adult. C.R. at 757 & 764. Dr. Trope reviewed Dr. Newberg's report and agreed that the abnormalities on Mercer's PET scan would lead to memory deficits. *Id*. at 759. She stated that using PET scans to diagnose psychiatric issues is well known and widely used because it can detect abnormalities that would not show up on an MRI. *Id*. at 759-60. Dr. Trope's ultimate diagnosis was that lead exposure while working for Employer caused Mercer to sustain a neurocognitive disorder. *Id*. at 761-64. She noted that her results were consistent with a September 2019 neuropsychological evaluation conducted on Mercer but acknowledged that the prior evaluation concluded that the cause of Mercer's current issues could not be determined with certainty. *Id*. at 763-64 & 780-81.

Dr. Trope maintained that Mercer's lead exposure while working for Employer was the "most significant" source of his issues rather than his long-ago drug use, given that he was able to function and hold jobs before working for Employer, but not afterwards. C.R. at 765-66. She did not detect signs of age-related degeneration, dementia or Alzheimer's disease. *Id*. at 774. Mercer did not report any head injuries. *Id*. at 775. She did not believe that Mercer's current symptoms were a reaction to losing his job with Employer. *Id*. at 767.

7

Dr. Trope stated that Mercer cannot return to work entailing lead exposure, which would worsen his condition; his attention, learning, and memory functions had been affected, which would hinder his ability to learn new skills. C.R. at 766-67. His trust and social issues, which were indirectly due to the exposure, would make it difficult for him to relate to new people at a different job, which was part of why he was unable to keep the two restaurant jobs he held briefly after being let go by Employer. *Id*. at 771 & 785.

Dr. Burton Weiss, M.D., testified for Mercer in a June 2021 deposition. C.R. at 850. He is board certified in psychiatry with a specialty in neuropsychiatry, which pertains to the behavioral and emotional consequences of brain injuries and diseases. *Id*. at 851. He maintains a clinical practice and has treated several adult patients with lead poisoning. *Id*. at 853-54. He evaluated Mercer in March 2021. *Id*. Mercer presented with headaches, anxiety, depression, short-term memory problems, and facial pain. *Id*. at 856 & 860. Mercer felt betrayed by Employer because it had not sufficiently protected him from lead exposure. *Id*. at 856-57. He reported that his only mental health issues were from his parents' separation when he was young, which led to difficulty in school. *Id*. at 857. Dr. Weiss did not detect a learning disability. *Id*. at 859.

Dr. Weiss diagnosed Mercer with permanent neurocognitive disorders caused by lead exposure and with adjustment disorder caused by the cognitive impairments. C.R. at 865. Dr. Weiss concluded that lead exposure was the most likely source of Mercer's current condition and that other sources could be eliminated. *Id*. at 861-64. Mercer's diffuse pattern of neurocognitive deficits is usually associated with head trauma, he reported no head injuries, and they were not indicated in the medical records; nor did he have a degenerative neurological

8

condition like Alzheimer's disease or Huntington's disease. *Id*. at 866. Mercer's condition was too recent and acute to be due to his past drug use, drinking, smoking, or aging. *Id*. at 866-67. Dr. Weiss also attributed Mercer's condition to lead exposure because he reported no functional, mental, or emotional issues before working for Employer. *Id*. at 869-70. Dr. Weiss did not believe Mercer would be able to work again. *Id*. at 868. He could not be subject to further lead exposure, would be unable to learn and retain new skills, and would tire too quickly to do manual labor. *Id*. at 868.

On cross-examination, Dr. Weiss acknowledged that he had not seen medical records prior to 2015, so he could only rely on Mercer's self-reported condition before working for Employer. C.R. at 872 & 879. He believed that Mercer's ability to do some restaurant and electrical work after his exposure was because he had done that kind of work before and did not need to learn new skills for it. *Id*. at 873. He did not believe Mercer could do those jobs on a full-time basis without significant built-in structure and accommodations. *Id*. at 875. He acknowledged that the Philadelphia school system may not have excelled at diagnosing and accommodating learning disabilities in the 1970s, but believed Mercer's report that his difficulties in school were due to his parents' separation. *Id*. at 881-82.

Maria Babinetz, M.S., testified for Claimant in a June 2021 deposition. C.R. at 983. She is a licensed professional counselor and a certified vocational expert. *Id*. at 988. She conducted an earning capacity evaluation on Mercer in early 2021. *Id*. at 994-95 & 1007-11. Mercer told her that before the lead exposure, he enjoyed playing musical instruments and had a black belt in martial arts, but he could no longer consistently enjoy these activities due to his physical and cognitive decline

9

since the exposure. *Id*. at 995. Babinetz specifically remarked on Mercer's intense current sense of uncertainty and loss of his previous social and functional wellbeing. *Id*. at 1001.

Babinetz concluded that Mercer read at a 4th grade level, spelled at a 3rd grade level, could do math at a 4th grade level, and had comprehension ability at a 4th grade level. *Id*. at 1011. He scored below average in tests for mechanical reasoning, spatial relations, verbal reasoning, and manual speed and dexterity. *Id*. at 1011-12. He was not employable in any capacity, whether skilled or unskilled, and his occupational ability "has been entirely and utterly eroded" since he worked for Employer. C.R. at 1015. Babinetz acknowledged a "congruency" between her conclusions and those of Drs. Newberg, Trope, and Weiss that Mercer's condition reflected a recent onset neurological condition arising since he began working for Employer in 2015, most likely due to the lead exposure. *Id*. at 1022-25.

On cross-examination, Babinetz acknowledged that Mercer had been able to get himself from Philadelphia to Fort Washington for their appointments without difficulty and that this showed a certain level of cognitive functionality. C.R. at 1026. She acknowledged that all medical records, tests, and reports she reviewed post-dated 2017, after Mercer was let go by Employer. *Id*. at 1031. She acknowledged Mercer's recent electrical work but noted that it was limited to basic tasks on an elective basis as opposed to holding a job, which requires showing up on time every day and doing what is asked or needed all day, which she did not feel was within Mercer's current ability. *Id*. at 1034-37.

Employer first presented a fact witness, Tony Cosia, who testified in a March 24, 2021, deposition. C.R. at 1190. He is Employer's safety manager and has done that job for ten years. *Id*. at 1196. He acknowledged that lead is involved

in Employer's work of manufacturing commercial radiators. *Id*. at 1197. When workers begin employment, they watch videos and receive handouts describing the dangers of lead exposure and the need for precautions. *Id*. at 1198, 1212-13. Mercer's workspace had exhaust fans and a ventilation system. *Id*. at 1200 & 1225. Employer provides uniforms, which are left at the workplace each day and sent out for cleaning, steel-tipped rubberized boots that are also left at the workplace after shifts, and hand and eye protection. *Id*. at 1201-02.

Cosia testified that Employer's workers are tested for lead every six months. C.R. at 1202-03. He would give employees their documents and get their signature for receipt. *Id*. at 1204-05. Mercer's first test in October 2015 showed a lead level of 31 and a zinc level of 95. In April 2016, he had a lead level of 34 and a zinc level of 135. C.R. at 1219. In November 2016, he had a lead level of 35 and a zinc level of 216. In May 2017, he had a lead level of 33 and a zinc level of 164. *Id*. Cosia acknowledged that after the April 2016 test, Employer's occupational health doctor recommended a follow-up test in May 2016 and that after Mercer's November 2016 test, the occupational health doctor recommended further testing and removal from the workspace. *Id*. at 1222-23. Mercer was told to follow up with his own doctor or occupational health, then report back to Employer. *Id*. at 1224. This was because Employer's level for removal and further testing based on lead exposure was 40, 10 points below the level of 50 set by the Occupational Safety and Health Administration (OSHA), neither of which Mercer's results ever reached. *Id*. at 1233. Mercer was laid off in September 2017 along with his work partner due to an industry slowdown and not because Mercer had high test results. *Id*. at 1207-08. Cosia acknowledged that Mercer was issued N-95 masks, but not an air purifying respirator with filter cartridges specifically for lead. *Id*. at 1227-28. This was

11

because Employer's lead levels are below the minimum point at which OSHA requires such equipment. *Id*. at 1228.

Employer next presented Dr. Michael Silverman, M.D., who testified in a September 2021 deposition. C.R. at 1252. He is board certified in internal medicine and infectious diseases. *Id*. at 1259. He maintains a general clinical practice that includes some patients with common psychological conditions like anxiety and depression and individuals with illnesses from toxic exposure. *Id*. at 1260-61. He reviewed Mercer's medical records and examined him in February 2021. *Id*. at 1262-63. Dr. Silverman noted that while Mercer's test results indicated lead exposure, the levels were not high enough to exceed OSHA's minimum of 50. *Id*. at 1266-67. He agreed, however, that no level of lead in the body is good. *Id*. at 1279. Mercer told him that none of his co-workers had issues or concerns with high lead levels at work. *Id*. at 1282-83.

Dr. Silverman's physical examination of Mercer was generally normal. *Id*. at 1269-70. Mercer reported that medication was helping with most of his symptoms and that he "basically felt like he was generally in good health at the present time." *Id*. at 1271. Dr. Silverman acknowledged that his evaluation of Mercer's mental state was largely based on observing him during their encounter; he agreed that a neuropsychological assessment would be more attuned to the details of Mercer's cognitive status and the impact of lead exposure on his brain. *Id*. at 1296-1300. However, given Mercer's learning difficulties in school, a preexisting undiagnosed congenital brain condition could not be ruled out as the cause of his current issues. *Id*. at 1301-04. At the least, Mercer appeared to have cognitive deficits prior to working for Employer that could call into doubt whether lead exposure was the definitive cause of his current issues. *Id*. at 1310.

12

Dr. Silverman opined that Mercer was physically capable of resuming work without restrictions and had agreed during the evaluation that he was able to do so. C.R. at 1273-74. Dr. Silverman would not necessarily return Mercer to a job specifically involving potential lead use or exposure because of the clear anxiety Mercer now has in that regard, and because the improvements Mercer has made in that area with medication and counseling would probably be compromised or erased. *Id*. at 1311-12. However, as a purely physical matter, Dr. Silverman did not have a problem with returning Mercer to work for Employer because his levels were never over Employer's limit or OSHA's limit. *Id*. at 1286-87 & 1291.

Employer next presented Dr. Nancy Minniti, Psy.D., who testified in a September 20, 2021, deposition. C.R. at 1351. She has a doctorate in clinical psychology and works in the neurology department at Temple University Hospital as a neuropsychologist, seeing patients with cognitive deficits. *Id*. at 1356. She reviewed Mercer's records and the other experts' reports and evaluated him in July 2021. *Id*. at 1360. She considered his early academic difficulties and noted that learning issues at a young age, if undiagnosed and unaddressed, can persist into adulthood and reflect as cognitive deficits. *Id*. at 1363. In that posture, the cognitive issues would always have been there and would not be signs of decline due to an exterior cause. *Id*.

Dr. Minniti pointed out that Babinetz had not addressed the possibility that Mercer had an undiagnosed learning disability. C.R. at 1366. Dr. Minniti next noted that Dr. Trope had not taken her own clinical history from Mercer but had relied mostly on records to collect his background information; this likely hindered Dr. Trope's conclusions, which Dr. Minniti also believed wrongly downplayed the possibility of a longstanding undiagnosed learning disability. *Id*. at 1367-68 & 1380-

13

81. According to Dr. Minniti, many of the testing techniques Dr. Trope used would have posed difficulties for someone with an undiagnosed learning disability, but it would seem as though the results were due to an exterior cause. *Id*. at 1369-70. Dr. Minniti found Mercer's reported difficulties and the fact that he had to repeat grades in school significant for a potentially undiagnosed learning disability. *Id*. at 1373. Mercer told her that he stopped doing martial arts about 20 years ago because he worried about head injuries and "did not want to end up like Muhammad Ali." *Id*. at 1372. However, Mercer did not report that he sustained any head injuries from martial arts, so Dr. Minniti did not view that, or his past drug use, as more than a potential contributor to his present cognitive status. *Id*. at 1394-95.

Dr. Minniti ultimately concluded that an undiagnosed learning disability was "very likely" the reason for Mercer's cognitive deficits. *Id*. at 1378 & 1382-83. Due to Mercer's age (60 years old), his school records may no longer exist, but his poor reading skills are more likely a lifelong issue caused by a learning disability. *Id*. at 1379. She was not aware of any studies or research tying lead exposure to reading issues. *Id*. at 1405. Moreover, in the 1970s, services for assessing and addressing learning disabilities "just weren't in place. . . . These things were likely not available in the Philadelphia school system when he went through." *Id*. at 1382. Mercer's need for tutoring in third grade stood out to Dr. Minniti as an indication of early learning issues. *Id*. She saw lead exposure as a less likely cause because Mercer did not have corresponding problems with daily functions like managing his household and finances, driving a vehicle, and keeping his doctors' appointments. *Id*. at 1384-85. She believed he could be employable in more or less the same capacity as before. *Id*. at 1384.

On cross-examination, Dr. Minniti acknowledged that Mercer did ultimately graduate high school, pass electricians' classes, and had not reported cognitive issues before working for Employer. C.R. at 1392-93. She attributed his decision to seek counseling after being let go by Employer to losing his job and having difficulty finding another. *Id*. at 1396. She agreed with Dr. Newberg that PET scans are scientifically acceptable to test brain metabolism as part of a diagnostic process but did not agree that they are suitable to provide a definitive diagnosis on their own or pinpoint the specific cause of an abnormality. *Id*. at 1400-03, 1406-07 & 1420. She questioned whether lead exposure, which is progressive, would have produced Mercer's deficits so soon after he stopped working for Employer. *Id*. at 1416-18. Mercer's ability to hold down various jobs throughout his life was not inconsistent with a learning disability; people with similar disabilities tend to go into "hands-on" vocations as Mercer has generally done. *Id*. at 1411-12. She did accept that returning to a job involving lead exposure might not be recommended for Mercer. *Id*. at 1419.

Employer next presented John Kashani, D.O., in an August 2021 deposition. C.R. at 1482. He is board certified in emergency medicine, toxicology, addiction medicine, and anti-aging and regenerative medicine. *Id*. at 1489. He maintains a clinical practice at the New Jersey State Poison Center. *Id*. at 1490. He has treated many adult patients with lead toxicity and lectured nationally on the subject. *Id*. at 1491-92. He did not personally examine Mercer but reviewed his medical records. *Id*. at 1493.

Dr. Kashani first explained that testing for zinc is relevant to lead toxicity because the two usually correspond: "If the zinc protoporphyrin is elevated, then it implies that there was an exposure." C.R. at 1500-01. Mercer's zinc and lead

15

tests reflected exposure, but his medical records did not exceed the recognized levels for toxicity or indicate other generally associated conditions, such as hypertension, neuropathy, anemia, and abdominal pain. C.R. at 1500-03. Dr. Kashani disagreed with Dr. Newberg on using PET scans to diagnose lead toxicity, explaining that they are suited to diagnosing seizure disorders, degenerative brain diseases, and myocardial conditions. *Id*. at 1504-05. Specifically, Dr. Kashani did not believe that Mercer's PET scan results could be directly attributed to his work-related lead exposure. *Id*. at 1506. The lead levels for two years of tests taken while Mercer worked for Employer simply were not high enough or of long enough duration to cause his current condition. *Id*. at 1509-10.

On cross-examination, Dr. Kashani acknowledged that a respirator mask with lead filtering cartridges would be recommended for workers exposed to lead in circumstances like those at Employer's facility. C.R. at 1532. If Employer's workers ate lunch while wearing their work clothes, oral ingestion of lead particles could occur. *Id*. at 1534. Smoking alone would not cause lead levels higher than 3-4. *Id*. at 1538. Lead exposure can result in cognitive declines. *Id*. at 1563. However, no studies have concluded there is any direct correlation between lead toxicity and PET scan results similar to Mercer's; although Mercer was exposed to lead while working for Employer, he showed none of the physical conditions generally associated with lead toxicity, and in Dr. Kashani's view, to make that connection "when there are absolutely no other manifestations is just not a leap of faith that I can agree with." *Id*. at 1571-72 & 1578-80.

Employer next presented the June 2022 deposition of Dr. Daniel Feinberg, M.D. C.R. at 1737. He is a neurologist and maintains an academic position and a clinical practice; he works with neuropsychologists on many of his

16

cases.  C.R. at 1741 & 1757.  He reviewed Mercer's records and examined him in February 2022.  *Id*. at 1744.  Dr. Feinberg evaluated Mercer's face and head nerves, motor functioning, reflexes, sensation, coordination, and walking, all of which were normal.  *Id*. at 1748-49.  He did not detect any speech or memory issues.  *Id*. at 1749. Lead toxicity patients have symptoms resembling Parkinson's disease, such as overactive reflexes, and Mercer had none of them.  *Id*.  Dr. Feinberg is familiar with PET scans and described them as most commonly used in neurology for research than as a diagnostic tool compared with an MRI.  *Id*. at 1751-52 & 1785.  There is no one clinical criterion for diagnosing a brain injury from lead exposure because the symptoms vary, but MRI results such as abnormal signal and demyelination in the basal ganglia, the caudate nuclei, the lentiform nuclei, and the thalamus, are fairly consistent in lead toxicity, and Mercer's April 2019 MRI had no such abnormalities. *Id*. 1752-53 & 1802.  Dr. Feinberg did not believe, given his examination and review of Mercer's normal MRI, that Mercer sustained any cognitive or psychiatric conditions from his exposure to lead.  *Id*. at 1754-55.

On cross-examination, Dr. Feinberg acknowledged that he did not have specific OSHA training.  C.R. at 1758.  Mercer's tests reflected lead exposure, but his normal MRI and lack of any recognized lead toxicity symptoms led Dr. Feinberg to conclude that lead exposure did not lead to any brain damage.  *Id*. at 1769.  Mercer reported headaches, but Dr. Feinberg did not conclude that they were due to a serious brain injury.  *Id*. at 1775.  With regard to Mercer's MRI, Dr. Feinberg stated: "I know, as a neurologist, what chronic lead intoxication does to the brain.  And those areas were normal."  *Id*. at 1780.  He added: "[T]o me, it's impossible that chronic lead toxicity, even at a low level to be present, that would cause those symptoms with that MRI scan.  Those two are completely incompatible."  *Id*. at 1781.  For lead

17

exposure to result in the symptoms Mercer reported, his MRI would be abnormal, and it was normal. *Id*. at 1782.

The WCJ issued a decision and order on January 26, 2023, denying Mercer's claim petition. C.R. at 26-50. On October 18, 2023, the Board issued a decision and order affirming the WCJ's order.[3] Mercer timely appealed to this Court.

## II. Issues

Mercer presents seven issues in this appeal.[4] First, he asserts that the WCJ capriciously disregarded relevant and competent evidence. Next, he argues that the WCJ failed to issue a reasoned decision. He also avers that the WCJ's findings and conclusions were not supported by substantial record evidence. He claims that the WCJ wrongly failed to apply the occupational disease rebuttable presumption. He challenges the WCJ's rejection of testimony by Employer's experts that Mercer should not be returned to work for Employer due to the danger of further lead exposure. He argues that his evidence established, at the least, a claim for medical monitoring and that the WCJ erred in denying that claim. Last, he avers that because his claim petition should have been granted, the WCJ should have awarded his litigation costs.

---

[3] Employer cross-appealed the admissibility of Dr. Newberg's testimony as scientifically unsound. C.R. at 155. The Board did not address that claim because it affirmed the WCJ's denial of Mercer's claim petition. *Id*. at 212.

[4] "This Court's review in workers' compensation appeals is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated." *DiPaolo v. UPMC Magee Women's Hosp. (Workers' Comp. Appeal Bd.)*, 278 A.3d 430, 433 n.5 (Pa. Cmwlth. 2022), *appeal denied*, 290 A.3d 237 (Pa. 2023).

## A. WCJ's Credibility Determinations: Capricious Disregard

Capricious disregard occurs when the factfinder deliberately ignores relevant, competent, and "apparently trustworthy" evidence. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004). Our Supreme Court has held that the standard "is not to be applied in such a manner as would intrude upon the agency's fact-finding role and discretionary decision-making authority." *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487-88 (Pa. 2002). The WCJ, as the ultimate factfinder in workers' compensation cases, has exclusive province over questions of credibility and evidentiary weight, and is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part. *Williams*, 862 A.2d at 143. The WCJ may reject even a witness's uncontradicted testimony. *Id*. at 144.

Mercer asserts that the WCJ capriciously disregarded evidence establishing that before September 2017, when Employer laid him off, he had an active and productive life. Mercer's Br. at 15-19. Mercer avers that this evidence supports his claim that the lead exposure he sustained while working for Employer caused his current condition of decreased physical and cognitive ability, which in turn renders him unable to work in any capacity. *Id*. Mercer points to uncontradicted evidence that before working for Employer, he had completed coursework to be a nursing assistant and an electrician, was active as a musician and in martial arts, had never been diagnosed with a learning disability, and that his school issues were due at first to his parents' separation and later to attendance issues rather than difficulty learning. *Id*. In particular, Mercer finds no basis for the WCJ's rejection of the testimony of Babinetz, the only vocational expert who testified in this matter. *Id*. Employer responds that the WCJ simply did not accept Babinetz's testimony, which

was well within the WCJ's discretion as the sole arbiter of witness credibility. Employer's Br. at 18-19.

Babinetz testified that Mercer told her that he was active as a musician and in martial arts before working for Employer but that since then, he was no longer able to enjoy those hobbies and activities due to his cognitive and physical decline. C.R. at 995. After conducting vocational testing and reviewing the reports of Drs. Newberg, Trope, and Weiss, Babinetz agreed with them that lead exposure was the cause of Mercer's current inability to work. *Id*. at 1022-25. She acknowledged, however, that she had seen no records or medical evidence predating Mercer's time working for Employer. *Id*. at 1031.

The WCJ rejected Babinetz's testimony on the basis that the "sole source" of Mercer's assertions that he had an active and productive lifestyle and no cognitive issues before working for Employer and that he was physically and mentally unable to work afterwards was his own assertions. C.R. at 47. Significantly, the WCJ also rejected Mercer's testimony after observing him at the final hearing in March 2022 and reviewing his previous deposition as well as his recounting of his history to all of the expert witnesses. *Id*. at 46-47. Specifically, the WCJ pointed out that Mercer did not report any symptoms or seek medical care while still working for Employer; he only reported symptoms after being let go. *Id*. at 47. He did not stop working because he was physically and mentally unable to do so, but because he was laid off. *Id*. He read and signed the test results he received from Employer, including the note from Employer's occupational health doctor that he should be removed from lead exposure, but he never questioned them or sought medical attention. *Id*. He was able to apply on his own for unemployment benefits after Employer laid him off. *Id*. Despite his assertions of cognitive issues rendering

20

him unable to work, he could manage his life on his own without assistance. *Id.* Last, the WCJ noted Mercer's statement at the final hearing that "I don't have nothing that relates to my exposure at work. That's done." *Id.*

The WCJ explained that her rejection of Mercer's testimony and, by extension, that of Babinetz and Mercer's other experts who relied on his self-reported history, was based on the above-listed discrepancies. C.R. at 47. Mercer was exposed to lead while working for Employer and clearly *believed* (WCJ's emphasis) that his current issues were due to that exposure, but his evidence failed to establish lead toxicity or that his current asserted deficiencies were due to his prior exposure. *Id.*

Analysis and weighing of evidence is the essence of the factfinder's role in workers' compensation matters and the WCJ may reject the testimony of any witness, including the claimant or an expert, even if the testimony is uncontradicted. *Williams*, 862 A.2d at 144. To meet the capricious disregard standard, that evidence must be competent and at least "apparently trustworthy." *Id.* Mercer's assertion of his previous abilities was generally consistent and uncontradicted, but it was also unsupported by any other evidence, and the WCJ did not find it trustworthy for the multiple reasons set forth above. We cannot say that this amounted to capricious disregard of that evidence such that this case presents an instance where we may "intrude upon the agency's fact-finding role and discretionary decision-making authority. *Wintermyer*, 812 A.2d at 487-88. Accordingly, the WCJ did not capriciously disregard dispositive evidence of record and the Board did not err in affirming the WCJ in this regard.

## B. Reasoned Decision

Section 422(a) of the Workers' Compensation Act (Act), 77 P.S. § 834,[5] provides that the parties are "entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transport)*, 828 A.2d 1043, 1047 (Pa. 2003). The statute also requires the WCJ to specify the evidence upon which he or she is relying, and to state the reasons for accepting that evidence. *Id.* In 1996, the General Assembly amended Section 422(a) to further elucidate the requirement for a reasoned decision, by adding the following two sentences:

> When faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the [WCJ] must identify that evidence and explain adequately the reasons for its rejection.

77 P.S. § 834. Section 422(a) concludes by noting that the WCJ's adjudication shall "provide the basis for meaningful appellate review." *Id.* Where there is conflicting evidence taken by depositions rather than before the WCJ in person, the WCJ must clearly explain the reasons for crediting one witness over another, such as qualifications, misplaced assumptions, or contradictions in testimony. *Daniels*, 828 A.2d at 1053.

"The requirement that the WCJ adequately explain his reasons for accepting or rejecting evidence protects the parties to a decision by ensuring that a legally erroneous basis for a finding will not lie undiscovered." *Lawry v. Cnty. of*

---

[5] Act of June 2, 1915, P.L. 736, *as amended*.

22

*Butler (Workers' Comp. Appeal Bd.)*, 310 A.3d 1286, 1289 (Pa. Cmwlth. 2024) (quoting *PEC Contracting Eng'rs v. Workers' Comp. Appeal Bd. (Hutchison)*, 717 A.2d 1086 (Pa. Cmwlth. 1998)). "For instance, if a WCJ rejects evidence based on an erroneous conclusion that testimony is equivocal, or that the evidence is hearsay or for some other reason incompetent, such legal error will be evident and can be corrected on appeal." *Id*. at 1289-90. However, the WCJ's prerogative to determine the credibility of witnesses and the weight to be accorded evidence "has not been diminished" by the amendments to Section 422(a) of the Act. *Id*. at 1290. This Court has explained:

> While many petitioners challenging an adverse credibility determination would suggest that we review each and every component of the WCJ's reasoning for substantial evidence and reverse or remand if we can find any flaw, we do not believe the reasoned decision requirement takes us so far from the traditional notions of the deference owed credibility determinations.

*Id*.

Mercer argues that no evidence of record, even that given by Employer's experts, supported the WCJ's apparent conclusion that symptoms of lead toxicity would have manifested while he worked for Employer. Mercer's Br. at 20-22. Therefore, the WCJ's reliance on his failure to report symptoms, seek medical care, or stop working as reasons to find him non-credible amounted to an unsupported "substitution of her own medical judgment" for that of any experts in this case. *Id*. According to Mercer, this renders the WCJ's decision insufficiently reasoned. *Id*. Similarly, Mercer asserts that his failure to follow up when Employer's occupational health doctor wrote on the October 2016 test result that he should be removed from work due to his zinc levels should not have been taken by the WCJ as a negative mark on his credibility because it was Employer's duty to

23

protect him, and he trusted Employer's judgment. This, according to Mercer, is another basis upon which the WCJ's decision is unreasoned, of which he lists several others. *Id.* at 23-27. Employer responds that Mercer's attacks on the WCJ's credibility determination regarding his testimony does not establish that her decision failed to provide sufficient reasons for her findings and conclusions. Employer's Br. at 19-22.

Mercer also challenges the WCJ's crediting of Employer's medical experts, asserting specifically that Dr. Kashani's testimony wrongly focused on acute levels of lead exposure even though he acknowledged that lower and chronic levels can also lead to lead toxicity. Mercer's Br. at 27. Mercer also notes that Dr. Kashani acknowledged that an abnormal MRI is not always a prerequisite for lead toxicity, while Dr. Feinberg stated that an abnormal MRI was always necessary for the diagnosis. *Id.* at 28. Mercer also emphasizes that none of Employer's experts could state definitively how long it takes for symptoms to manifest or for abnormalities to reflect on an MRI or whether there is a definitive exposure level below which no toxicity would occur, although they generally agreed that no level of lead in the body is "good." *Id.* at 28-29. Mercer similarly points to other areas of Employer's experts' testimony that he posits were deficient compared with that of his own experts and maintains that the WCJ's faulty credit determinations rendered her decision insufficiently reasoned. *Id.* at 30-35. Employer responds that Mercer's attacks on the WCJ's credibility determination regarding the experts' testimony fails to establish that her decision failed to provide sufficient reasons for her findings and conclusions. Employer's Br. at 22-26.

Regarding Mercer's testimony, the WCJ summarized both his initial deposition and his in-person hearing testimony in detail. C.R. at 29-31. As noted,

24

the WCJ explained that while Mercer clearly believed that the lead exposure was the cause of his current condition, his testimony on the whole did not provide a sufficient basis to conclude that the exposure had actually caused his symptoms or rendered him unable to work. *Id.* at 47. Although Mercer's lack of symptoms while working for Employer did not necessarily mean that he did not have lead toxicity, as a matter of credibility, it was within the WCJ's discretion to observe Mercer's apparent lack of contemporary concern, even when shown a note that Employer's occupational clinic doctor thought his zinc levels were high enough to warrant further testing and removal from workplace lead exposure.[6] *Id.* Likewise, it was within the WCJ's purview to note that by Mercer's own reporting, his symptoms did not manifest until after he was laid off for economic reasons and that despite his asserted inability to work, he was able to care for himself and manage his life with relatively little cognitive, physical, or functional difficulty. *Id.*

Regarding the medical experts' testimony, the WCJ summarized their depositions in detail. C.R. at 33-46. In crediting Employer's experts, the WCJ listed multiple bases, including Dr. Kashani's board certification and teaching and lecturing credentials in toxicology, his OSHA training in lead toxicity, and his explanation between lead exposure and lead toxicity; Mercer's lack of the recognized symptoms of lead toxicity; the reason why a PET scan is not a definitive tool for diagnosing lead toxicity; and why Mercer's low level chronic exposure would not be the reasonable cause of any cognitive or functional issues he reported. *Id.* at 48. The WCJ pointed to Dr. Silverman's agreement that the levels shown on Mercer's test results were insufficient to cause his reported symptoms, and that none of Mercer's test results exceeded Employer's "safety level" of 40, which was

---

[6] As explained by Dr. Kashani, zinc protoporphyrin levels in the blood correlate with lead exposure and serve as a useful testing component. *See* C.R. at 1500-01.

25

significantly lower than the OSHA level of 50. *Id.* The WCJ also relied on Mercer's normal MRI and neurological examination. *Id.* The WCJ further noted Dr. Minniti's conclusion that an undiagnosed learning disability was likely the cause of his current condition, a view shared by another neuropsychologist who evaluated Mercer in September 2019 but was not called by Mercer to testify. *Id.* Conversely, the WCJ stated: "None of [Mercer's] experts adequately explained their opinions that [Mercer's] lead exposure with Employer even approached the level of 'toxic,' nor did they adequately explain how [Mercer's] lead exposure caused his alleged symptoms." *Id*. at 49.

Mercer strenuously challenges these credibility determinations by the WCJ but has not established that they were insufficiently explained or based on wholly erroneous or incompetent evidence. As this Court explained in *Lawry*, "we do not believe the reasoned decision requirement takes us so far from the traditional notions of the deference owed credibility determinations" as Mercer desires. *See* 310 A.3d at 1290. As the WCJ's decision was sufficiently reasoned, the Board did not err in affirming in this regard.

### C. Substantial Evidence of Record

In a substantial evidence challenge, "it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Columbia Cnty. Comm'rs v. Rospendowski (Workers' Comp. Appeal Bd.)*, 286 A.3d 436, 446 (Pa. Cmwlth. 2022). We review the entire record to determine if it contains evidence a reasonable mind might find sufficient to support the WCJ's findings and if the record contains such evidence, the findings must be upheld even though the

record contains conflicting evidence. *Id.* This inquiry requires that we "view the evidence in the light most favorable to the prevailing party and give [that party] the benefit of all inferences reasonably deduced from the evidence." *Id.*

Mercer poses his substantial evidence challenge in the same section of his brief as his "reasoned decision" challenge regarding the WCJ's determination that his testimony was not credible and that Employer's experts' testimony was credible. Mercer's Br. at 19-35. The gist of his argument is that the WCJ's reasons for her determinations were nearly all fatally flawed and unsupported by, respectively, the consistency of his own testimony and inconsistencies in Employer's experts' testimony. *Id.* Employer responds that the WCJ's determinations were all properly supported by substantial record evidence. Employer's Br. at 18-26.

With regard to Mercer's testimony, as discussed above, the WCJ stated that while Mercer believed that his current condition was caused by lead exposure while working for Employer, he had not established that his condition was disabling or that his subjective belief regarding causation was sound. C.R. at 47. Although he occasionally got nasal soreness and nosebleeds that he thought were from fumes in the workplace, he generally did not feel unwell while working and did not report those incidents to Employer. C.R. at 340. He applied for and accepted unemployment benefits, receipt of which is conditioned on an assurance that the claimant can work. *Id.* at 345. He filed a civil suit against Employer asserting that he was let go due to his age rather than because of his lead exposure. *Id.* at 408. He can care for himself personally and manage his medical appointments and bills. *Id.* at 421-22. He received and signed his periodic test results, including the one with a note from Employer's occupational health doctor stating that his high zinc levels

27

warranted additional testing and recommending removal from the workplace, but did not follow up with Employer or with occupational health. *Id.* at 431-33. When asked at the final hearing in March 2022 "what symptoms do you have which you relate to your exposure at work," he responded: "I don't have nothing that relates to my exposure at work. That's done." *Id.* at 249.

Although Mercer also testified that he had no serious issues before working for Employer and that he now feels physically, mentally, and emotionally unable to work because of his prior lead exposure, "it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Columbia Cnty. Comm'rs*, 286 A.3d at 446. The WCJ concluded that Mercer's testimony did not credibly support the extent of his claimed symptoms because he did not report any issues at all until after he was let go by Employer, either for economic reasons, for cause (given his testimony that he was told he "just didn't make out" on the job), or his age, based on his acknowledgement of the civil suit he filed against Employer. C.R. at 47. The WCJ, having observed Mercer testify in person, concluded that he bore resentment towards Employer and had anxiety concerning his exposure to lead and believed that the exposure was the cause of his current issues, but his testimony did not establish that he suffered from cognitive or physical issues because of that exposure, either currently or ever. *Id.* at 47. This conclusion was supported by Mercer's stated ability throughout this litigation to care for himself and manage his life on his own since the exposure and his statement at the final hearing that he no longer had any symptoms that he related to the exposure. *Id.* Even with the existence of contradictory evidence, a reasonable mind could certainly find this sufficient to support the WCJ's determination that Mercer's

testimony was not credible to support his claims; therefore, that determination was supported by substantial evidence of record.

With regard to the experts' testimony, Dr. Silverman, an internist, testified for Employer that none of Mercer's test results exceeded OSHA's recommended level of 50 or even Employer's internal level of 40. C.R. at 1266-67. Mercer told him that none of his co-workers had issues or concerns with lead exposure. *Id*. at 1282-83. Dr. Silverman stated that based on his review of records and interview with Mercer, an undiagnosed learning disability could not be definitively ruled out as the cause of his current cognitive issues. *Id*. at 1301-04. He would not return Mercer to employment involving lead exposure but specified that this was due to his observation of Mercer's anxiety about exposure and concern that the mental and emotional improvements Mercer has made would be compromised or erased if he returned to a similar or same environment. *Id*. at 1311-12. In crediting Dr. Silverman, the WCJ emphasized his testimony about the low lead levels in Mercer's test results and his normal physical and neurological findings in his examinations of Mercer. *Id*. at 47.

Dr. Minniti, a neuropsychologist, testified that a learning disability, based on Mercer's need for tutoring in elementary school and need to repeat grades in high school, more likely caused or at least contributed to Mercer's current cognitive deficiencies. C.R. at 1366-78. For example, Mercer's reading scores are particularly low and reading ability would not reasonably be affected by lead exposure. *Id*. at 1379 & 1405. Although Mercer was never diagnosed with a learning disability, Dr. Minniti explained that in the 1970s, school systems were generally not yet equipped to detect such issues to the present extent. *Id*. at 1382. She did not believe that chronic low-level lead exposure would lead to cognitive

deficiencies as quickly after the exposure as Mercer claimed, which was just after he was let go by Employer in September 2017. *Id*. at 1416-18. Mercer had passed coursework to be a nursing aide and electrician and had held various kinds of jobs throughout his life before working for Employer, but this was not inconsistent with Dr. Minniti's theory because people with learning disabilities tend to go into "hands-on" vocations like Mercer has generally done. *Id*. at 1411-12. The WCJ credited Dr. Minniti's learning disability theory as viable and noted that it was supported by a neuropsychology report issued two years earlier by another doctor, whom Mercer did not call to testify. *Id*. at 48.

Finally, Dr. Kashani testified for Employer. He noted that Mercer's test results were consistent with lead exposure but were not dispositive of lead toxicity, particularly in the absence of the physical conditions associated with lead toxicity, such as hypertension, neuropathy, anemia, and abdominal pain, none of which Mercer has ever reported or been diagnosed with having. C.R. at 1500-02, 1571-72 & 1578-80. Dr. Kashani explained that the PET scan, upon which Dr. Newberg relied, is not recognized as a definitive way to diagnose lead toxicity. *Id*. at 1504-05. He agreed with Dr. Minniti that Mercer's lead levels for two years of tests taken while he worked for Employer simply were not high enough or of long enough duration to cause his current condition. *Id*. at 1509-10. The WCJ specifically emphasized Dr. Kashani's credentials and experience and credited his testimony that Mercer has never experienced the physical conditions associated with lead toxicity and that the duration and levels of lead exposure Mercer sustained would not be sufficient to cause the symptoms he related. *Id*. at 47.[7]

---

[7] Although the WCJ did not explain her reasoning for crediting Dr. Feinberg's testimony and partly rejected Cosia's testimony as Employer's fact witness, there was substantial evidence to support the WCJ's decision even without that evidence. *See* C.R. at 47-48.

30

Although Employer's experts testified to one degree or another that lead toxicity can result in varied and even diffuse manifestations and that in the absence of baseline lead testing before Mercer worked for Employer, it can be difficult to diagnose or rule out definitively, we reiterate that "it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Columbia Cnty. Comm'rs*, 286 A.3d at 446. The WCJ concluded that the testimony of Employer's experts was more convincing than that of Mercer's experts and provided reasons based on references to their record testimonies. Even with the existence of contradictory evidence, a reasonable mind could certainly find this sufficient to support the WCJ's determination that Employer's experts' testimonies were credible and sufficient to refute the allegations in Mercer's claim petition; therefore, that determination was supported by substantial evidence of record.

### D. Occupational Disease Rebuttable Presumption

Section 108 of the Act, added by Act of Oct. 17, 1972, P.L. 930, specifically provides that lead poisoning or toxicity is a compensable occupational disease. 77 P.S. § 27.1(a) (stating that the term "occupational disease," as used in the Act, includes "[p]oisoning by . . . lead . . . in any occupation involving direct contact with, handling thereof, or exposure thereto"). Section 301(e) of the Act also provides a rebuttable presumption in this context. 77 P.S. § 413 (stating that if a claimant, "at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the [claimant's] occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive"). Our Supreme Court

31

has explained that a claimant seeking to recover for an occupational disease "is given a procedural or evidentiary advantage" over claimants who must definitively establish both injury and causation. *Pawlosky v. Workmen's Comp. Appeal Bd. (Latrobe Brewing Co.)*, 525 A.2d 1204, 1211 (Pa. 1987). "Once such a claimant establishes that he has contracted an occupational disease and that the disease, at or immediately before the date of disability, was a hazard in his occupation or industry, he then becomes entitled to a non-conclusive presumption that his occupational disease arose out of and in the course of his employment." *Id*.

However, the claimant must first establish that he or she has actually sustained and been disabled by the claimed occupational disease in order to be eligible for the presumption. *Rex v. Workers' Comp. Appeal Bd. (City of Oil City)*, 879 A.2d 854, 862 (Pa. Cmwlth. 2005). If the question whether the claimant has sustained an occupational disease is in dispute and the WCJ concludes that based on the competent and relevant evidence of record, the preponderance of the evidence is "to the negative," then the presumption will not apply. *Patton v. Workers' Comp. Appeal Bd. (Lane Enters., Inc.)*, 958 A.2d 1126, 1134 (Pa. Cmwlth. 2008) (relying on *Helverson v. Workmen's Comp. Appeal Bd. (Central Foundry Co.)*, 463 A.2d 1243, 1246 (Pa. Cmwlth. 1983).

Mercer argues that the WCJ erred in declining to apply the presumption on the basis that he did not establish that he actually sustained lead toxicity. Mercer's Br. at 37. He asserts that even if the WCJ did not conclude that he sustained disability, the WCJ should have at least concluded that he sustained a work-related injury because two of Employer's experts stated that he should not be returned to work in an environment posing risk of further lead exposure. *Id*. at 37-39 (citing *Jackson Twp. Volunteer Fire Co. v. Workers' Comp. Appeal Bd. (Wallet)*, 594 A.2d

32

826 (Pa. Cmwlth. 1991) (*Jackson Township*)). Mercer posits that if the WCJ had found that Mercer sustained an injury, regardless of whether he also established disability, then the presumption should have been applied. *Id*. Employer responds that Mercer proved neither that he had lead toxicity or that he was disabled due to it, and his failure to meet his burden of proof rendered the presumption inapplicable. Employer's Br. at 27-29.

The WCJ acknowledged that lead toxicity is a recognized occupational disease under the Act and that Mercer clearly sustained lead exposure while working for Employer. C.R. at 49. However, the WCJ noted that the presumption is only available if the claimant establishes both the existence of the disease and disability resulting therefrom. *Id*. at 49 (citing *Patton*). To that point, the WCJ concluded: "While [Mercer] argues that Employer has not provided an alternative explanation for his alleged symptoms, it is not Employer's burden to do so. It is [Mercer's] burden to prove that he has lead toxicity causing disability; here, [Mercer] has failed to meet this burden." *Id*.

In *Patton*, the claimant's widow alleged that the claimant sustained pneumoconiosis, chronic bronchitis, and chronic obstructive pulmonary disease as a result of working for the employer as a welder for 13 years. 958 A.2d at 1127. Two medical experts testified that workplace exposure caused the claimant's conditions, while the employer presented two medical experts who testified to the contrary. *Id*. at 1133. The WCJ found the employer's experts more credible and declined to apply the presumption. *Id*. This Court concluded that the WCJ's determination was based on substantial record evidence and affirmed. *Id*. at 1134.

Similarly, in *Helverson*, the claimant alleged permanent disability from silicosis due to 25 years working for the employer. 463 A.2d at 1243. The parties

33

presented competing medical experts on causation, and the WCJ, concluding that the employer's expert's testimony was more credible, declined to apply the presumption. *Id*. at 1246. This Court acknowledged that the claimant's expert's testimony constituted substantial evidence in support of his claim, but emphasized the primacy of the WCJ's role in weighing and crediting expert testimony and found no basis to overturn the WCJ's determination or conclusion. *Id*.

Mercer relies on *Jackson Township*, where the WCJ ordered the employer to pay medical costs associated with testing the claimant, an ambulance worker, for AIDS and hepatitis after he was spattered with an infected accident victim's blood and bodily fluids. *Id*. at 828-29. The Board affirmed, as did this Court. We limited our holding to the facts, which were that the claimant was exposed to the "serious risk of contracting a disease which is commonly known to be highly contagious/infectious and potentially deadly" and where infection may occur with a single exposure. *Id*. In those circumstances, we concluded that the claimant's risk of contracting AIDS or hepatitis from the exposure constituted an "injury" due to the "seriousness and immediacy of the risk created by exposure" to the disease; we also noted that the claim was limited, at least at that point, to the costs of testing and monitoring for the diseases. *Id*.

Relevant to this case, the employer in *Jackson Township* analogized the claimant's request for AIDS and hepatitis testing to forcing coal mine employers to pay for workers to be tested for lung issues after every shift on the basis that they might develop issues later in life. *Id*. at 829. We expressly rejected that analogy, emphasizing that AIDS and hepatitis are "so contagious and deadly that a person may contract them after being exposed only once." *Id*. Thus, although the facts of

this case align with the employer's hypothetical in *Jackson Township*, that case is clearly distinguishable here.

Further, *Jackson Township* did not involve the occupational disease presumption. This Court issued a factually limited holding expanding the accepted limits of what constitutes an "injury," based on the nature of the diseases in question and the similarly limited remedy sought, the costs of testing. Here, Mercer asks this Court to expand that holding to effectively negate his prerequisite burden to show that he actually sustained a work-related occupational disease in order to access the presumption. Moreover, in *Jackson Township*, the WCJ held in the claimant's favor based on the evidence in that case, which does not appear to have involved expert medical testimony. Here, the WCJ rejected the claimant's position after hearing from multiple experts on both sides and evaluating their testimonies thoroughly.

For these reasons, this case is more analogous to *Patton* and *Helverson*. As in those cases, this Court has no basis to overturn the WCJ's reasoned and supported credibility determinations as to the non-occurrence of an occupational disease and the legal conclusion based on those determinations that the presumption does not apply. Accordingly, the WCJ did not err in declining to apply the presumption and the Board did not err in affirming in this regard.

### E. Employer's Experts' Testimony Concerning Return to Work

Mercer next argues that the WCJ erred by denying his claim petition when two of Employer's experts, both of whom the WCJ credited, acknowledged that he should not return to work in a lead-oriented environment. Mercer's Br. at 40-41 (citing *Crowell v. Workmen's Comp. Appeal Bd. (Johnson Dairy Farm)*, 665 A.2d 30, 33 (Pa. Cmwlth. 1995) (stating that "[i]t is inherently unfair and contrary

35

to the humanitarian purpose underlying the Act to force any claimant to choose between receiving no benefits at all and returning to the work force under conditions which will cause him continuing pain and may potentially cause him further injury")). Employer responds that Mercer's argument cherry-picks and mischaracterizes the experts' testimony. Employer's Br. at 30-31. We agree.

In *Crowell*, the claimant sustained a right foot injury; the employer paid benefits for a period of time before suspending those payments. 665 A.2d at 31. When the claimant sought reinstatement, the WCJ accepted the claimant's doctor's testimony that although the claimant would be in pain, he could work; accordingly, the WCJ denied the claimant's reinstatement petition and the Board affirmed. *Id*. at 32. We reversed, first noting the comparatively low standard for reinstatement after suspension: the claimant need not show a causal connection between the original injury and the current disability. *Id*. We also noted that forcing a claimant to work in pain and at risk of worsening an injury is sufficient for reinstatement, consistent with the humanitarian goals of the Act. *Id*. at 33.

Here, Dr. Silverman testified that Mercer was physically capable of resuming work without restrictions and that Mercer had agreed during the evaluation that he was able to do so. C.R. at 1273-74 & 1312. Dr. Silverman would not necessarily return Mercer to a job involving potential lead use or exposure because of the anxiety Mercer now has about lead and because the improvements he has made in that area would probably be compromised or erased. *Id*. at 1311-12. Any other type of work would be physically reasonable to Dr. Silverman. *Id*. at 1312. Similarly, Dr. Minniti stated that from a psychological standpoint, Mercer would be employable "at the level he has been employable all along." C.R. at 1384. She later acknowledged that returning him to work particularly for Employer "may be

36

contraindicated" as "the experts recommend he do[es] not have further exposure to lead." *Id.* at 1419. The WCJ did not specifically address this aspect of Employer's experts' testimony, but credited their opinions and, by denying Mercer's claim petition, the WCJ implicitly accepted their primary conclusions that no physical or psychological basis existed to keep Mercer out of work other than for Employer. C.R. at 48-49.

The Board distinguished *Crowell* on the facts but did not elaborate. C.R. at 210. We agree that *Crowell* is distinguishable. First, reinstatement from an accepted injury is a lower standard for the claimant and does not require a showing of causation. Also, the WCJ in *Crowell* found as a fact that the claimant would be in pain if returned to work. Here, the WCJ did not find Mercer sustained an injury and did not find him credible as to the extent or even veracity of his reported symptoms and issues. Moreover, Dr. Silverman's acknowledgement that returning Mercer to a lead-oriented environment would not be recommended was expressly qualified by his statement that the reason was not because of an actual threat due to further exposure, but simply Mercer's subjective concerns about exposure. While those concerns have general validity in light of the agreement by all experts that lead exposure is not good for the body, in the absence of an actual injury or occupational disease, compensation is not indicated. Accordingly, the WCJ did not err in giving more weight to Employer's experts' testimony that Mercer could resume work generally and without restrictions than to those experts' acknowledgements that returning Mercer to a lead-oriented environment might not be optimal, and the Board did not err in affirming in this regard.

37

## F. Medical Monitoring

In *Brendley v. Pennsylvania Department of Labor & Industry, Bureau of Workers' Compensation*, 926 A.2d 1276, 1281 (Pa. Cmwlth. 2007), the claimant sought medical monitoring for brain cancer for a putative class of claimants who were exposed to carcinogens at their workplace but had no symptoms. *Id*. at 1277. In addressing Brendley's claims, this Court discussed *Jackson Township* and *Lash v. Workmen's Compensation Appeal Board (General Battery Corporation)*, 420 A.2d 1325 (Pa. 1980). In *Lash*, the workers exposed to lead had "abnormally high" test results. *Id*. at 1326. There was no dispute that they had sustained lead poisoning, but the condition was in the early stages and the workers had no symptoms. *Id*. at 1326. The employer removed the workers to jobs where they were not exposed to lead, but their pay was lower. *Id*. Our Supreme Court ultimately held that the workers were entitled to partial benefits because removing them from further lead exposure at work was medically warranted and compensating for their lost wages served the Act's goals. *Id*. at 1327. After considering these cases in *Brendley*, this Court concluded that a claim for medical monitoring may be compensable if the facts show that a claimant has been exposed to hazardous substances at a level sufficient to create a risk of future harm that can only be remedied by continued testing.[8] 926 A.2d at 1281.

Mercer argues that the WCJ should have granted medical monitoring even if it denied his claim for an occupational disease and disability. Mercer's Br. at 41-42. Mercer avers that the lead exposure he sustained amounts to an injury within the meaning of the Act, including the evidence of the note by Employer's

---

[8] However, we ultimately concluded in *Brendley* that a class action was not appropriate under the Act and directed Brendley to file a claim petition so that a WCJ could determine whether his medical monitoring claim was compensable. 926 A.2d at 1283.

occupational health doctor recommending further testing and removal from the workplace and the precedent in *Jackson Township* and *Lash*.  *Id*. at 43.  Employer responds that Mercer's lead exposure was never at levels high enough to constitute an injury based on risk of worsening or warrant removal from the workplace, therefore monitoring is not indicated here.  Employer's Br. at 30.

The WCJ did not directly address medical monitoring, but by denying Mercer's claim petition, implicitly denied that aspect of his claim.  C.R. at 48-49.  The Board distinguished *Lash* because the claimants there already had abnormally high lead levels and early-stage lead toxicity diagnoses even though they were asymptomatic.  C.R. at 211.  The Board noted that Mercer's levels were never abnormal; whether he sustained actual lead toxicity was in dispute and was resolved in the negative by the WCJ; therefore, there was no basis to grant for medical monitoring. *Id*.  We agree.

As the Board noted, the claimants in *Lash* had high levels and early-stage lead toxicity diagnoses; the issue was not causation, but whether they warranted partial benefits to compensate their lost earnings when they were moved to lower paying jobs away from lead exposure.  In *Jackson Township*, the claimant was exposed to a highly contagious and deadly disease, where a single exposure could be dispositive, and the need for testing and monitoring was imminent.  By contrast, Mercer established only exposure, and never at levels high enough to meet OSHA's stated minimum or even Employer's lower internal minimum.  The WCJ credited Employer's experts' opinions that Mercer did not have lead toxicity, even in an early stage like the workers in *Lash*.  Although the experts from both sides generally agreed that no lead is good for the body, this case does not present circumstances sufficiently similar to *Jackson Township* for this Court to expand that

holding beyond its expressed limits so as to encompass unlimited testing for any worker exposed to lead on the job in the absence of actual toxicity or a clear medical risk associated with potential re-exposure at similar non-toxic levels. Accordingly, the WCJ did not err in denying Mercer's claim for medical monitoring and the Board did not err in affirming in this regard.

## G. Litigation Costs

Section 440(a) of the Act, added by Act of February 8, 1972, P.L. 25, provides:

> In any contested case . . . the employe . . . in whose favor the matter at issue has been finally determined in whole or in part shall be awarded, in addition to the award for compensation, a reasonable sum for costs incurred for attorney's fee, witnesses, necessary medical examination, and the value of unreimbursed lost time to attend the proceedings . . . .

77 P.S. § 996(a). Our Supreme Court has held that "when a contested case is resolved in favor of an employee, a reasonable sum for attorney's fees *shall* be awarded to the claimant." *Lorino v. Workers' Comp. Appeal Bd. (Cmwlth. of Pa.)*, 266 A.3d 487, 494 (Pa. 2021) (emphasis in original). As the statute also includes the costs incurred by a party for witnesses and necessary medical examinations, such costs are also warranted when the claimant is successful. However, there is no basis for an award of litigation costs when the claimant is not successful. *Lawhorne v. Lutron Elecs. Co. (Workers' Comp. Appeal Bd.)*, 284 A.3d 239, 244 (Pa. Cmwlth. 2022) (stating that a claimant "must prevail on the contested issue in order to be awarded litigation costs").

Mercer argues that because the WCJ erred in failing to grant his claim petition, should this Court reverse, his attorneys must recover their litigation costs.

40

Mercer's Br. at 44. However, Mercer has not prevailed on any aspect of this appeal. As such, Employer is not bound to pay his litigation costs. The WCJ did not err in declining to assess those costs against Employer and the Board did not err in this regard.

### III. Conclusion

For the foregoing reasons, the order of the Board affirming the order of the WCJ denying Mercer's claim petition is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jerry Mercer, : 
                Petitioner : 
                    : 
         v. : 
                    : 
Active Radiator MPN, Inc. (Workers' : 
Compensation Appeal Board), :   No. 1326 C.D. 2023
             Respondent : 

# **O R D E R**

AND NOW, this 3rd day of June, 2024, the October 18, 2023, order of the Workers' Compensation Appeal Board, which affirmed the January 27, 2023, order of the Workers' Compensation Judge, which denied Jerry Mercer's claim petition, is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge